# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

TIMOTHY GARDNER, TECK
ELECTRIC, LLC, and PETER
STRICKLAND,

    Plaintiffs,

    v.

STEPHEN JESSUP, in his
individual and official
capacity,

    Defendant.

CASE NO. 2:24-CV-11

## ORDER

Before the Court is Defendant Stephen Jessup's motion to dismiss. Dkt. No. 32. The motion has been fully briefed and is ripe for review. Dkt. Nos. 32, 34, 36, 40, 41. The Court heard oral argument on March 13, 2025. Dkt. No. 38. For the reasons set forth below, the Court **GRANTS in part** Defendant's motion.

## BACKGROUND[1]

This case arises out of events surrounding the 2022 McIntosh County (Georgia) Commission Election. Dkt. No. 28. In the May 2022

---

[1] At this stage, the Court must "accept all factual allegations in a complaint as true[,] and take them in the light most favorable to [the] plaintiff[.]" Dusek v. JPMorgan Chase & Co., 832 F.3d 1243, 1246 (11th Cir. 2016).

Primary Election, Plaintiff Timothy Gardner ran for McIntosh County Commissioner. Id. ¶ 31. Gardner was a Republican candidate and had two opponents: Stuart Peterseim and Davis Poole, Jr. Id. ¶ 32. Mr. Poole was friends with the McIntosh County Sheriff—Defendant Jessup. Id. ¶ 33. In an effort to assist Mr. Poole's campaign, Plaintiffs allege, Defendant Jessup began telling McIntosh County constituents that Mr. Gardner is a drug dealer and/or is the second largest drug dealer in the county. Id. ¶ 35. Plaintiffs also allege Defendant used his county-owned vehicle to drive Mr. Poole around and escorted Mr. Poole into government buildings within the county, both for campaign purposes. Id. ¶¶ 40-41.

Plaintiffs allege Defendant told government employees not to vote for Plaintiff Gardner because he was a drug dealer and, while on duty and wearing his Sheriff's uniform, Defendant is alleged to have gone door-to-door to spread these statements among McIntosh County voters. Id. ¶¶ 36, 41. According to the Complaint, Defendant also told other police officers to encourage Mr. Poole's candidacy; he instructed the deputies to drive around the county, while on duty, and tell people to vote for Mr. Poole instead of Gardner. Id. ¶ 42. Plaintiffs allege that on the day of the Primary Election, and again on the day of the Runoff Election, Defendant stood outside the voting precinct in his Sheriff's uniform and promoted Mr. Poole by holding a sign with Mr. Poole's name on it.

Id. ¶¶ 43, 44. Furthermore, Defendant allegedly "intimidated McIntosh County constituents by threatening negative consequences on them and/or their families" if they did not vote for Mr. Poole. Id. ¶ 45. For instance, Plaintiffs allege that Defendant "insinuated to [Plaintiff Peter] Strickland that if he voted for Mr. Gardner, rather than Mr. Poole, Sheriff Jessup would 'keep a special eye on him.'" Id. ¶ 46. According to the Complaint, Defendant's actions resulted in McIntosh constituents not voting for Gardner in the Primary and/or Runoff Elections. Id. ¶ 48.

The Brunswick News published an article on September 17, 2022, in which Defendant Jessup denied accusing Plaintiff Gardner of being a drug dealer, and instead said that Gardner "was tied to a drug dealer and is still tied to [a drug dealer]." Dkt. Nos. 10 at 39; 28 ¶ 38. Plaintiffs allege that such statements are defamatory and that such statements carried into February 2023 and continue today. Dkt. No. 28 ¶¶ 35–36, 38–39.

Plaintiff Gardner is the sole owner and member of Plaintiff Teck Electric, LLC. Id. ¶ 26. The business is located in McIntosh County and the residents know that Teck Electric is Gardner's business. Id. The Complaint alleges that due to the statements made by Defendant, "numerous customers have not hired Mr. Gardner and/or his company." Id. ¶ 49. For example, Plaintiff Gardner claims that between February 2022 and April 2022 Richard E. Braun, Jr., the City Manager for Darien (located within McIntosh County),

promised that he would hire Gardner and Teck Electric to be the City Building Inspector, Maintenance Supervisor, and Electrician. Id. ¶ 50. Other McIntosh County employees witnessed these promises. Id. Although Mr. Braun told Gardner that it was unnecessary for him or Teck Electric to apply for these positions because they were going to be awarded the roles, Gardner and Teck Electric still completed applications around July 2022. Id. ¶¶ 51–52. Defendant was not a party to the agreement between Braun, Gardner, and Teck Electric. Id. ¶ 53. Plaintiff alleges that despite that, Defendant told Mr. Braun that Gardner was a drug dealer and/or was tied to a drug dealer and that Mr. Braun should not award Gardner or Teck Electric the city's business. Id. ¶ 54. Ultimately, Gardner and Teck Electric were not awarded the business. Id. ¶ 93.

Plaintiffs filed suit on January 19, 2024. Dkt. No. 1. In the operative second amended complaint, Plaintiffs assert claims against Defendant Jessup for defamation, tortious interference with business and contractual relations, and violations of their constitutional rights. Dkt. No. 28. Defendant has moved to dismiss Plaintiffs' complaint in its entirety. Dkt. No. 32.

## LEGAL AUTHORITY

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." While this pleading

standard does not require "detailed factual allegations," "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 570). A complaint is plausible on its face when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

In deciding whether a complaint states a claim for relief, the Court must accept the facts alleged in the complaint as true and draw all reasonable inferences in favor of the plaintiff. Ray v. Spirit Airlines, Inc., 836 F.3d 1340, 1347 (11th Cir. 2016). The Court should not accept allegations as true if they merely recite the elements of the claim and declare that they are met; legal conclusions are not entitled to a presumption of truth. Iqbal, 556 U.S. at 678-79.

A complaint must "contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." Fin. Sec. Assurance, Inc. v. Stephens, Inc., 500 F.3d 1276, 1282-83 (11th

Cir. 2007) (per curiam) (quoting Roe v. Aware Woman Ctr. for Choice, Inc., 253 F.3d 678, 683 (11th Cir. 2001)). Ultimately, if "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'—'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

While the factual allegations set forth in the complaint are to be considered true at the motion to dismiss stage, the same does not apply to legal conclusions set forth in the complaint. Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1260 (11th Cir. 2009) (citing Iqbal, 556 U.S. at 678). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. The Court need not "accept as true a legal conclusion couched as a factual allegation." Twombly, 550 U.S. at 555 (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)). Furthermore, the Court "is not required to credit conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts." Warren Tech., Inc. v. UL LLC, 962 F.3d 1324, 1328 (11th Cir. 2020) (citation and quotations omitted).

Lastly, "[u]nder the incorporation-by-reference doctrine, a court may consider evidence attached to a motion to dismiss without converting the motion into one for summary judgment if (1) 'the plaintiff refers to certain documents in the complaint,' (2) those

documents are 'central to the plaintiff's claim,' and (3) the documents' contents are undisputed." <u>Baker v. City of Madison, Ala.</u>, 67 F.4th 1268, 1276 (11th Cir. 2023) (citations omitted).

**DISCUSSION**

**I.  Plaintiff Gardner's 42 U.S.C. § 1983 Claim**

Section 1983 of Title 42 of the United States Code ("§ 1983") provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. This creates a right of action for vindicating federal rights guaranteed by the Constitution and federal statutes. <u>Baker v. McCollan</u>, 443 U.S. 137, 144 n.3 (1979). Section 1983 is not a source of substantive rights. <u>Id.</u> To prevail on a § 1983 claim, a plaintiff must establish that "the conduct complained of (1) was committed by a person acting under color of state law and (2) deprived the complainant of rights, privileges, or immunities secured by the Constitution or laws of the United States." <u>Harvey v. Harvey</u>, 949 F.2d 1127, 1130 (11th Cir. 1992) (citing <u>Flagg Bros. v. Brooks</u>, 436 U.S. 149, 156–57 (1978)).

In this case, Plaintiff Gardner alleges that Defendant violated his constitutional right to run for public office. Dkt.

No. 28 ¶¶ 99–101. In response, Defendant asserts that Gardner did not adequately plead any constitutional violation and that even if he did, qualified immunity bars the claim. Dkt. No. 32 at 17–21.

The Eleventh Circuit has held that there is a constitutional right to run for public office. Randall v. Scott, 610 F.3d 701, 713 (11th Cir. 2010); Cook v. Randolph Cnty., 573 F.3d 1143, 1152 (11th Cir. 2009); McCormick v. Edwards, 646 F.2d 173, 175 (5th Cir. May 28, 1981).[2] Gardner claims that Defendant interfered with his candidacy. Specifically, Gardner asserts that Defendant spread false and defamatory statements about him, told McIntosh residents to vote for Gardner's opponent while Defendant was on-duty and wearing his Sheriff's uniform, and directed on-duty deputies to drive around the county and tell residents to not vote for Gardner. See, e.g., Dkt. No. 28 ¶¶ 5, 8, 36, 41–42, 47, 99–100. Even when accepting these allegations as true, as required when ruling on a motion to dismiss, Plaintiff Gardner does not sufficiently plead a constitutional violation giving rise to a claim under § 1983.

Although Plaintiff Gardner alleges that Defendant engaged in untoward behavior during the campaign, untoward behavior does not equate to a violation of Gardner's right to run for office. Indeed, the Complaint itself shows that Gardner was not prevented from

---

[2] Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981).

actually running for office. He was not removed from the ballot, barred from campaigning, forbidden from fundraising, disqualified from running, or otherwise prevented from pursuing his candidacy. Instead, Gardner's allegations, if true, suggest that Defendant interfered with Gardner's ability to *win* the election. Gardner has no constitutional right to victory. See Flinn v. Gordon, 775 F.2d 1551, 1554 (11th Cir. 1985) (stating that there is no constitutional right to win an election because that is a political decision for the electorate to make).

Even assuming, *arguendo*, that Defendant intended to infringe on Gardner's right to run for office, the Complaint shows that "the attempt to deprive him of that right did not succeed." Cook, 573 F.3d at 1152. The fact that Defendant's alleged efforts, if true, were unsuccessful in impeding Gardner's ability to run for office "makes all the difference." Id. Section 1983 provides an avenue to vindicate federal rights. Baker, 443 U.S. at 144 n.3. Absent a sufficiently alleged violation of Gardner's federal rights, there is nothing for Section 1983 to protect.

The Court finds Plaintiff Gardner has failed to adequately allege a constitutional violation to support his § 1983 claim.[3]

---

[3] Because the Court finds that Plaintiff fails to allege a constitutional violation, the Court need not address Defendant's qualified immunity argument.

Accordingly, Defendant's motion to dismiss Plaintiff Gardner's § 1983 claim is **GRANTED**.

## II. Plaintiff Strickland's Claim for Violation of the Voting Rights Act of 1965

Section 11(b) of the Voting Rights Act ("VRA") states:

> No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote, or intimidate, threaten, or coerce any person for exercising any powers or duties under section 10302(a), 10305, 10306, or 10308(e) of this title or section 1973d or 1973g of Title 42.

52 U.S.C. § 10307(b). Plaintiff Strickland alleges that Defendant violated the VRA by taking actions to intimidate him into voting for Mr. Poole instead of the candidate of his choice, Plaintiff Gardner. Dkt. No. 28 ¶¶ 102–10. Defendant argues that Plaintiff Strickland's claim must be dismissed because Section 11(b) of the VRA does not provide a private right of action. Dkt. No. 35 at 21. Defendant is correct.

Only Congress has the authority to create private rights of action. Alexander v. Sandoval, 532 U.S. 275, 286 (2001). "The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." Id. Put differently, the Court must determine whether a statute contains language to

(1) create a right and (2) provide a private remedy to enforce the right. As it pertains to Section 11(b), the parties have not provided, nor has the Court identified through its survey of the caselaw, any binding precedent addressing either factor. Currently, there is a split among courts as to whether a private right of action exists. Compare Andrews v. D'Souza, 696 F. Supp. 3d 1332, 1350–51 (N.D. Ga. 2023) (finding no private right of action); Schilling v. Washburne, 592 F. Supp. 3d 492, 498 (W.D. Va. 2022) (finding no private right of action) with Mich. Welfare Rts. Org. v. Trump, 600 F. Supp. 3d 85 (D.D.C. 2022); Ariz. Democratic Party v. Ariz. Republican Party, No. CV-16-03752, 2016 WL 8669978, at *4 (D. Ariz. Nov. 4, 2016); Nat'l Coal. on Black Civic Participation v. Wohl (NCBCP I), 498 F. Supp. 3d 457, 476 (S.D.N.Y. 2020); Nat'l Coal. on Black Civic Participation v. Wohl (NCBCP II), 512 F. Supp. 3d 500, 509 (S.D.N.Y. 2021); Nat'l Coal. on Black Civic Participation v. Wohl (NCBCP III), 661 F. Supp. 3d 78, 112 (S.D.N.Y. 2023); Rhodes v. Siver, No. 19-12550, 2021 WL 912393 (E.D. Mich. Mar. 10, 2021) (all finding private right of action). As explained below, Section 11(b) of the VRA creates a private *right* but does not create a private *remedy*.

## A. Private Right

Rights-creating language "confer[s] a right directly on a class of persons that include[s] the plaintiff." Cannon v. Univ. of Chi., 441 U.S. 677, 690 n.13 (1979) (collecting examples of

statutes with rights-creating language). Previously, courts considered the "contemporary legal context" that Congress acted against when interpreting a statute. See, e.g., Morse v. Republican Party of Va., 517 U.S. 186, 231–32 (1996). More recently, the U.S. Supreme Court has clarified that when "determining whether statutes create private rights of action, as in interpreting statutes generally, legal context matters only to the extent it clarifies text." Sandoval, 532 U.S. at 288 (internal citations omitted). Accordingly, it is the text that guides the Court's interpretation today.

The critical language in Section 11(b) is "[n]o person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote . . . ." 52 U.S.C. § 10307(b). This provision mirrors statutory language that the Eleventh Circuit has previously concluded contains "right[s]-creating language." Schwier v. Cox, 340 F.3d 1284, 1296 (11th Cir. 2003). In Schwier, the court examined 42 U.S.C. § 1971(a)(2)(B), which states "'[n]o person acting under color of law shall . . . deny the right of any individual to vote in any election because of an immaterial error or omission on any record or paper relating to any application, registration, or other act requisite to voting . . . .'" Id. (quoting 42 U.S.C. § 1971(a)(2)(B) (alterations adopted)). The Eleventh Circuit concluded that Section 1971

contained "rights-creating language" because while "[t]he subject of the sentence is the person acting under color of state law, [] the focus of the text is nonetheless the protection of each individual's right to vote." Id. Section 11(b) mirrors the statutory language of Section 1971(a)(2)(B), thus, in light of Schwier, the Court concludes that Section 11(b) contains rights-creating language.[4]

---

[4] Based on Eleventh Circuit precedent, the Court concludes that Section 11(b) contains rights-creating language. However, the Court acknowledges that this statute could reasonably be read the other way. Critically, the Sandoval Court stated that statutory language "that focus[es] on the person regulated rather than the individuals protected create[s] no implication of an intent to confer rights on a particular class of persons." Sandoval, 532 U.S. at 289 (citations omitted). The pertinent language in Sandoval was from Section 602 of Title VI, which states "[n]o person . . . shall . . . be subjected to discrimination . . . ." 532 U.S. at 289 (quoting 42 U.S.C. § 2000d). At first glance, this appears similar to the relevant language in Section 11(b) of the VRA which reads "[n]o person . . . shall intimidate, threaten, or coerce . . . ." 52 U.S.C. § 10307(b). However, the meaning of the word "person" differs between these statutes, and that difference matters greatly.

In Section 602 of Title VI, "person" applies to an individual who is protected from the harm that the statute guards against—discrimination. In other words, "person" is the individual receiving the benefit of the protections guaranteed by the statute. Conversely, in Section 11(b) of the VRA, "person" refers to an individual engaging in the prohibited conduct of intimidation, threats, or coercion. Put differently, "person" as it is used in Section 11(b) of the VRA references the party being regulated. The Supreme Court has repeatedly held that when a statute focuses on the person being regulated instead of the individual being protected, there is "no implication of an intent to confer rights on a particular class of persons." Sandoval, 532 U.S. at 289 (citations omitted); see also Schilling, 592 F. Supp. 3d at 498. Applying that reasoning here, the Court could conclude that the language of Section 11(b) does not show that Congress intended to create a private right of action for individual plaintiffs.

This conclusion is bolstered by the fact that other courts, both within the Eleventh Circuit and beyond, have also held that Section 11(b) contains rights-creating language. See, e.g., Andrews, 696 F. Supp. 3d at 1350-51 ("With regard to rights-creating language, Section 11(b) defines a class of persons—any person voting, attempting to vote, or aiding anyone in voting or attempting to vote (among others)—and their right to not be intimidated, threatened, or coerced."); Colo. Mont. Wyo. State Area Conference of the NAACP v. U.S. Election Integrity Plan, 653 F. Supp. 3d 861, 868 (D. Colo. 2023) (concluding that under Sandoval, Section 11(b) contains rights-creating language).

Although important, this conclusion alone is not dispositive to the Sandoval analysis. "The judicial task is to interpret the statute Congress has passed to determine whether it displays an

---

Moreover, some of the district court decisions finding that Section 11(b) provides a private right of action did not have the benefit of Sandoval. See, e.g., Ariz. Democratic Party, 2016 WL 8669978, at *4 (relying on Allen v. State Bd. of Elections, 393 U.S. 544 (1969)); NCBCP I, 498 F. Supp. 3d at 476 (determining that Section 11(b) provides a private right based on Arizona Democratic Party and Allen, but not engaging in the Sandoval analysis); NCBCP II, 512 F. Supp. 3d at 509 (stating "[a]s the Court previously recognized, this statute sweeps broadly in accordance with Congress's goal of realizing, enforcing, and protecting the Fifteenth Amendment's right to vote" but not applying Sandoval); NCBCP III, 661 F. Supp. 3d at 112 (reiterating NCBCP I and NCBCP II in addition to relying on League of United Latin Am. Citizens - Richmond Regional Council 4614 v. Pub. Int. Legal Found. ("LULAC"), No. 1:18-cv-423, 2018 WL 3848404 (E.D Va. Aug. 13, 2018), and Arizona Democratic Party, 2016 WL 8669978); Rhodes, 2021 WL 912393 (relying on NCBCP I's holding that Section 11(b) includes a private right).

intent to create not just a private *right* but also a private *remedy*." <u>Sandoval</u>, 532 U.S. at 286 (emphasis added) (citing <u>Transam. Mortg. Advisors, Inc. v. Lewis</u>, 444 U.S. 11, 15 (1979)). In other words, even if a statute creates a private right, it does not create a cause of action unless it also creates a private remedy. Thus, the Court turns to the question of private remedy.

**B. Private Remedy**

Section 11(b) of the VRA fails to include a private remedy. "[T]he Voting Rights Act was adopted pursuant to Congress' authority to enforce the Fourteenth and Fifteenth Amendments," and was "designed to remedy pervasive racial discrimination." <u>Nipper v. Smith</u>, 39 F.3d 1494, 1515–16 (11th Cir. 1994). As such, "[c]ongressional actions [] must remain rooted in the purpose of the amendments." <u>Id.</u> "The Fourteenth Amendment's Equal Protection Clause provides that a state shall not 'deny to any person within its jurisdiction the equal protection of the laws'" and "[t]he Fifteenth Amendment provides that 'the right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.'" <u>Ga. State Conf. of NAACP v. Georgia</u>, No. 1:21-CV-5338, 2022 WL 18780945, at *6 (N.D. Ga. Sept. 26, 2022) (per curiam) (first quoting U.S. Const. amend. XIV, § 1, then quoting U.S. Const. amend. XV, § 1) (alterations adopted). A successful Fourteenth Amendment equal protection claim requires

proof of discrimination and a Fifteenth Amendment claim
"require[s] evidence of a racially discriminatory motivation."
Greater Birmingham Ministries v. Sec'y of State, 992 F.3d 1299,
1321 (11th Cir. 2021). Thus, while "these provisions are quite
different, they overlap in one vital respect—they both prohibit
race-based discrimination as it relates to voting." Ga. State Conf.
of NAACP, 2022 WL 18780945, at *6 (citing Greater Birmingham
Ministries, 992 F.3d at 1321).[5] Critically, no allegations of
racial discrimination are asserted in this case.

Neither the Court nor the parties identify any controlling
authority supporting that "Section 11(b) is designed to protect
the guarantees of those constitutional amendments," such that it
would fit within the VRA's enforcement provision, Section 14.[6]

---

[5] Plaintiffs incorrectly analyze this prong of the Sandoval test.
In their brief, Plaintiffs argue that the second element of
Sandoval is satisfied because the text of section 11(b), "which
discusses harms done to an individual and the tests developed
interpreting the statute, show that the harm is to the individual
voter who was unable to cast a vote free of coercion." Dkt. No. 34
at 16. If anything, this might be relevant to whether the statute
provides a private right, but it provides no insight into whether
section 11(b) provides a private remedy as required to establish
a private right of action.

[6] In their brief, Plaintiffs rely on White v. Alabama, 74 F.3d
1058, 1069 (11th Cir. 1996), to suggest that Section 11(b) was
enacted to enforce the rights in the Fourteenth and Fifteenth
amendments. Critically, however, in White, the Eleventh Circuit
concluded that "*Section 2* was enacted to enforce the Fifteenth
Amendment's prohibition against denying a citizen the right to
vote 'on account of race.'" Id. (quoting U.S. Const. amend. XV)
(emphasis added). As discussed infra, Section 2 is distinguishable
from Section 11(b). Section 2, unlike Section 11(b), specifically
targets race-based discrimination in accordance with the Fifteenth

_Andrews_, 696 F. Supp. 3d at 1351. In fact, one case on which Plaintiff relies identifies "the Elections Clause—not the Fifteenth Amendment—as the constitutional authority for § 11(b)." _LULAC_, 2018 WL 3848404, at *3.[7] Plaintiffs also direct the Court to _Georgia State Conference of NAACP_, but their reliance on that decision is misplaced. 2022 WL 18780945, at *6. _Georgia State Conference of NAACP_ involved Section 2 of the VRA, which prohibits "both intentional _and unintentional_ race-based discrimination in voting matters." _Id._ (emphasis in original). Because Section 2 and the Fourteenth and Fifteenth Amendments "share a core prohibition against intentional race-based discrimination," that provision supports a private right of action. _Id._ Plaintiff argues that Section 11(b) is similar because it attempts to protect the right

---

Amendment. Thus, _White_ does not require a different conclusion here.

[7] Plaintiffs argue that _LULAC_ "mistakenly conflated the right to vote (as reflected in the Fifteenth Amendment) with specifics regarding the logistics of voting (as reflected in the Elections Clause)" and point to _Ex parte Yarborough (The Klu Klux Cases)_, 110 U.S. 651 (1884), for support. Dkt. No. 41 at 12. Specifically, Plaintiffs contend that in _Ex parte Yarborough_ "the Supreme Court expressly recognized that the Fifteenth Amendment 'may operate as the immediate source of a right to vote' while explaining that the Elections Clause specifically regulates the times, places, and manner of holding congressional elections." _Id._ at 12-13. While it is true that the Supreme Court acknowledged that "under some circumstances" the Fifteenth Amendment "may operate as the immediate source of a right to vote," it did so in recognition that at the time not all former slave-holding states had removed "from their constitutions the words 'white man' as a qualification for voting," so the amendment "did, in effect, confer on [a man of color] the right to vote." _Ex parte Yarborough_, 110 U.S. at 665.

to vote by prohibiting intimidation, threats, or coercion. Dkt. No. 41 at 11. However, this ignores the critical difference between Sections 2 and 11(b); unlike Section 2, Section 11(b) makes no reference to race-based discrimination. Absent this "share[d] core prohibition," the conclusion in Georgia State Conference of NAACP cannot extend to the circumstances of this case. Accordingly, the Court concludes that "there is no identifiable link between the rights created under Section 11(b) of the VRA and any statutory language demonstrating congressional intent to provide a private remedy for a violation of those rights" in furtherance of "the voting guarantees of the fourteenth or fifteenth amendment." Andrews, 696 F. Supp. 3d at 1351; see also 52 U.S.C. § 10310(e).

Plaintiffs also point to the fact that some district courts have concluded a private remedy exists in Section 11(b) because Section 14 of the VRA, which covers "enforcement proceedings," allows for a prevailing party (other than the United States) to be awarded attorney's fees "[i]n any action or proceeding *to enforce the voting guarantees of the fourteenth or fifteenth amendment*." 52 U.S.C. § 10310(e) (emphasis added); see also, e.g., Mich. Welfare Rts. Org., 600 F. Supp. 3d at 106 ("It therefore cuts against the VRA's text to read § 12 of the VRA, which gives the Attorney General power to enforce various VRA sections, including § 11, as the exclusive method for enforcing VRA § 11(b)." (citation omitted)); NCBCP II, 512 F. Supp. 3d at 509 (stating that Section

18

11(b) "sweeps broadly in accordance with Congress's goal of realizing, enforcing, and protecting the Fifteenth Amendment's right to vote" but not engaging in the _Sandoval_ analysis). This argument fails for two reasons.

First, as discussed above, the Court does not deem the language in Section 11(b) to fall within the ambit of enforcing the Fourteenth or Fifteenth Amendment, so Section 14 does not apply. Second, notwithstanding the district court cases discussed _supra_, the Court concludes that the canons of statutory interpretation require finding that Section 11(b) confers no private remedy. Section 12(d) of the VRA states, in relevant part:

> Whenever any person has engaged . . . in any act or practice prohibited by section _10307 of this title_ [which includes Section 11(b)], . . . the Attorney General may institute for the United States, or in the name of the United States, an action for preventive relief, including an application for a temporary or permanent injunction, restraining order, or other order, and including an order directed to the State and State or local election officials to require them (1) to permit persons listed under chapters 103 to 107 of this title to vote and (2) to count such votes.

52 U.S.C. § 10308(d) (emphasis added). Section 12(d) specifically states that it applies to Section 11 and "expressly delegates enforcement authority to the Attorney General while making no mention of a private right of action." _Schilling_, 592 F. Supp. 3d at 498 (citing 52 U.S.C. § 10308(d)). Conversely, Section 14's enforcement provision makes no explicit reference to any provision of the VRA.

"A well established canon of statutory interpretation succinctly captures th[is] problem: it is a commonplace of statutory construction that the specific governs the general." RadLAX Gateway Hotel, LLC v. Amalgamated Bank, 566 U.S. 639, 645 (2012) (citation and quotation omitted) (alterations adopted). In other words, "[g]eneral language of a statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in another part of the same enactment." D. Ginsberg & Sons v. Popkin, 285 U.S. 204, 208 (1932) (citation omitted). Here, Section 14 is the more general provision because it does not explicitly apply to any portion of the VRA. See Ga. State Conf. of NAACP, 2022 WL 18780945, at *5–6 (finding that Section 14 "impl[ies] that private parties have a right to sue to enforce *some* provision or provisions of either the VRA or other federal laws" but then analyzing whether it applies to specific sections of the VRA (emphasis in original)). On the other hand, Section 12(d) is a specific provision because it details the exact VRA provisions to which it applies.

In sum, the Court finds that Congress provided no private remedy under Section 11(b) of the VRA. This conclusion is supported by traditional canons of statutory interpretation and other district court decisions. Accordingly, Defendant's motion to

dismiss Plaintiff Strickland's Section 11(b) Voting Rights Act claim is **GRANTED**.[8]

### III. Plaintiffs' State Law Claims

The only federal law claims in this action—Plaintiff Gardner's Section 1983 claim and Plaintiff Strickland's Voting Rights Act claim—have been dismissed. As a result, all the remaining claims are state law claims: Plaintiff Gardner's claims for defamation, defamation per se, and tortious interference, and Plaintiff Teck Electric's claims for defamation per se and tortious interference. The Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims because they lack an independent jurisdictional basis. See 28 U.S.C. § 1367(c)(3) (permitting a court to decline exercising supplemental jurisdiction when it "has dismissed all claims over which it has original jurisdiction"); see also Raney v. Allstate Ins. Co., 370 F.3d 1086, 1088–89 (11th Cir. 2004) ("The decision to exercise supplemental jurisdiction over pendant state claims rests within the discretion of the district court. We have encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial." (citations omitted)); Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are

---

[8] Because the Court holds that Section 11(b) of the VRA does not provide a private remedy, Plaintiffs' standing argument is moot.

eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.").

Therefore, Plaintiffs' state law claims for defamation, defamation per se, and tortious interference, as well as the related claims for punitive damages, are **DISMISSED without prejudice**.[9] See <u>Carnegie-Mellon Univ.</u>, 484 U.S. at 350 ("[W]hen the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." (citing <u>Mine Workers v. Gibbs</u>, 383 U.S. 715, 726-27 (1966)) (footnote omitted)); <u>see also</u> <u>Smith v. Franklin Cnty.</u>, 762 F. App'x 885, 891 n.3 (11th Cir. 2019) (affirming the district court's dismissal without prejudice of state law claims after it granted summary judgment on the federal claims).

## CONCLUSION

To be sure, the Court *does not* find that Defendant Jessup acted appropriately. All the Court *does* find is that a violation of the U.S. Constitution has not been properly alleged. For these reasons, Defendant Jessup's motion to dismiss, dkt. no. 32, is

---

[9] Because the Court declines to assert supplemental jurisdiction over the defamation and defamation per se claims, the Court does not address whether those claims were properly renewed under O.C.G.A. § 9-2-61(a).

**GRANTED** as to:

- Plaintiff Gardner's Section 1983 claim (Count V); and

- Plaintiff Strickland's Voting Rights Act § 11(b) claim (Count VI).

These claims are therefore **DISMISSED with prejudice.** Further, the Court declines to exercise supplemental jurisdiction as to Plaintiffs' state law claims, that is:

- Plaintiff Gardner's defamation claim (Count I);

- Plaintiffs Gardner and Teck Electric's defamation per se claim (Count II);

- Plaintiffs Gardner and Teck Electric's claim for punitive damages (Count III); and

- Plaintiffs Gardner and Teck Electric's claim for tortious interference (Count IV).

Plaintiffs' state law claims are therefore **DISMISSED without prejudice.**

There being no claims remaining in this federal action, the Clerk is **DIRECTED** to enter judgment in favor of Defendant on the federal claims and close this case.

**SO ORDERED** this 26th day of June, 2025.

_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA